1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

MY NGUYEN,

                        Plaintiff,

        v.

DENIS MCDONOUGH,

                        Defendant.

CASE NO. 3:23-cv-05790-DGE

ORDER ON MOTION FOR
SUMMARY JUDGMENT (DKT.
NO. 21)

    Presently before the Court is Defendant's motion for summary judgment.  (Dkt. No. 21.)

The Court has considered the pleadings filed in support of and in opposition to the motion and

the remainder of the record.   For the reasons set forth below, Defendant's motion is GRANTED.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

**A.  The Parties**

1.  <u>My Nguyen, M.D.</u>

    Plaintiff My Gia Nguyen, M.D. was born on May 26, 1961 in Saigon, South Vietnam and

immigrated to the United States in 1975.  (Dkt. No. 25-4 at 8, 101.)  Plaintiff graduated from

Brookings High School in South Dakota in 1979, from Dartmouth College in 1983 and Columbia University Law School in 1990. (*Id.* at 12.) Plaintiff obtained a master's degree in biophysics and physiology from Georgetown University in 1997 or 1998 and graduated from the Sidney Kimmel Medical College of Thomas Jefferson University in 1999. (*Id.* at 12–13.) Plaintiff completed his residency at Hunterdon Medical Center in 2002. (*Id.* at 13.)

Plaintiff began working for the United States Department of Veterans Affairs ("The VA") on November 9, 2009. (*Id.* at 14.) Plaintiff began working at the VA Puget Sound on May 29, 2016, and is currently employed as a physician examiner at the American Lake division of the VA's Compensation and Pension ("C&P") service. (*Id.* at 14–15.) Plaintiff's duties include performing physical examinations and chart reviews to ascertain whether a veteran is entitled to disability benefits, and to write medical opinions if requested. (*Id.* at 15–16.) Plaintiff also reviews cases on remand from the Board of Veterans' Appeals ("BVA"), which the C&P service expects physician examiners to complete within seven calendar days from the date of the exam. (*Id.* at 18–19.)

2. Simon Kim, Ph.D.

Dr. Kim is currently employed as Associate Director at the VA's Office of Inspector General. (Dkt. No. 25-2 at 10.) Dr. Kim was previously employed as Associate Director at the VA Puget Sound from 2018 to 2023. (*Id.* at 10–11.) Dr. Kim is Korean-American, and holds a doctorate in clinical psychology. (*Id.* at 11–12.) Dr. Kim was Acting Chief of the C&P service and Plaintiff's first-line supervisor in 2018. (*Id.* at 13–14.)

3. Carrie LaBelle, M.D.

Dr. LaBelle has worked for the VA since 2004, when she was hired as a staff physician, and began working at the VA Puget Sound in 2012. (Dkt. No. 25-3 at 11.) Dr. LaBelle is white

and is currently Director of the C&P service, a position she has held since March 3, 2019.  (*Id.* at 10–12.)  Dr. LaBelle became Plaintiff's supervisor on this date.  (*Id.* at 38.)

### B.  Nguyen's 2018 Suspension

On July 12, 2018, Dr. Kim sent Plaintiff a letter proposing to suspend him for 14 days, citing five charges relating to conduct that occurred in April and May 2018: (1) inappropriate behavior toward veteran patients and staff members, (2) unprofessional conduct, (3) inappropriate comments, (4) absence without official leave, and (5) failure to follow leave procedures.  (Dkt. No. 25-5 at 121–128.)

With respect to Charge 1, Dr. Kim alleged that on May 1, 2018, Plaintiff conducted a disability examination of a patient for a potential increase in his disability rating.  (*Id.* at 121.) After Plaintiff touched the patient's thumb, the patient informed Plaintiff that he had issues with his right thumb, and asked Plaintiff to refrain from applying pressure to it, at which point Plaintiff accused the patient, "in a loud and rude tone," of fabricating his story about Plaintiff touching his thumb and accused the patient of trying to intimidate him.  (*Id.*)  During the examination, a staff member gave the patient an instrument to identify the location of his scar. (*Id.*)  Plaintiff scolded the staff member for doing so, stating "I am the examiner and physician here, are you[?]" (*Id.*)

During an examination of a different patient on April 19, 2018, Plaintiff said to the patient that he was "glad [the patient] had only 8 years of service because the examination would take too long." (*Id.*)  When the patient informed Plaintiff that he had over 20 years of service, Plaintiff became "agitated, rude, and aggressive," questioning how the patient's past providers diagnosed his conditions.  (*Id.*)  When the patient suggested Plaintiff check his medical record, Plaintiff stated "that is not my job." (*Id.*)  Plaintiff then began to aggressively question the

1    patient, "raising his voice in efforts (sic) to minimize [patient's] condition to disapprove his

2    claim." (*Id.*)  When the patient asked questions about the examination process, Plaintiff

3    responded that he did not "have time to explain four years of medical school" to the patient.  (*Id.*)

4        As for Charge 2, on May 1, 2018, Plaintiff abruptly left work without authorization and

5    failed to transfer care responsibilities for two patients to another provider.  (*Id.* at 122.)  With

6    respect to Charge 3, on May 1, 2018, Plaintiff allegedly said of a staff member that "she [was]

7    not a doctor," stated she was "as dumb as dumb can get" and called her a "stupid, stupid girl."

8    (*Id.*)  Charges 4 and 5 both relate to Plaintiff's unauthorized absence from work on May 1, 2018.

9    (*Id.*)

10       In a memorandum accompanying the proposed suspension, Dr. Kim noted that there had

11   been "[n]o similar cases of this nature" at the VA Puget Sound during the previous three years.

12   (*Id.* at 124.)  In determining the appropriate penalty, Dr. Kim assessed mitigating and

13   aggravating factors.  Dr. Kim found no mitigating circumstances.  (*Id.* at 128.)  As an

14   aggravating factor, Dr. Kim cited a February 1, 2018 letter of written counseling issued to

15   Plaintiff for "failure to follow appropriate protocols for patient related encounters."  (*Id.* at 124.)

16   Dr. Kim stated Plaintiff had shown no remorse for his actions and demonstrated a lack of

17   understanding of how his actions "could be perceived as undermining, minimizing or threatening

18   to patients and staff members." (*Id.* at 128.)  Dr. Kim felt a reprimand would be an insufficient

19   sanction because it would not provide Plaintiff "with the personal understanding he would need

20   to effect change and bring necessary and expected leadership." (*Id.*)

21       On July 24, 2018, Medical Center Director Michael Tadych sustained the charges related

22   to unprofessional conduct, absence without official leave, and failure to follow leave procedures.

23

24

1  (*Id.* at 136–137.)  Tadych reduced the proposed suspension from 14 days to three, and Plaintiff

2  was suspended from September 10, 2018 through September 12, 2018.  (*Id.*)

3       On August 14, 2018, Plaintiff contacted an Equal Employment Opportunity ("EEO")

4  counselor at the VA's Office of Resolution Management ("ORM").  (Dkt. No. 25-5 at 11.)

5  Plaintiff sought to have his suspension rescinded, arguing Dr. Kim suspended him based on his

6  national origin.  (*Id.* at 12.)  Informal counseling was unsuccessful, and Plaintiff filed a formal

7  EEO complaint on December 3, 2018.  (*Id.* at 3, 14–15.)  In his complaint, Plaintiff alleged he

8  was subject to disparate treatment based on national origin and that his suspension was unduly

9  harsh.  (*Id.* at 4.)  Plaintiff also alleged retaliation stemming from an initial denial of a Family

10  and Medical Leave Act ("FMLA") request and violations of the Health Insurance Portability and

11  Accountability Act ("HIPAA").  (*Id.* at 4–5.)  Plaintiff also alleged Dr. Kim docked two weeks

12  of his pay, despite the fact that his suspension only lasted three days.  (*Id.* at 5.)  Plaintiff also

13  asserted that Dr. Kim rated his mid-term performance as "marginal" based on the suspension.

14  (*Id.*)

15       On February 26, 2019, the ORM sent Plaintiff a letter dismissing his FMLA and HIPAA

16  charges, but accepting for investigation five distinct incidents which Plaintiff alleged were the

17  result of discrimination based on national origin, specifically: (1) Plaintiff's three-day

18  suspension, (2) Dr. Kim's rating of Plaintiff's performance as "marginal" in an August 28, 2018

19  mid-term evaluation, (3) Plaintiff's receipt of only partial payment for the pay period of

20  September 21, 2018 and Dr. Kim's threat to classify Plaintiff as AWOL if Plaintiff did not meet

21  with him, (4) Plaintiff's failure to receive any pay for the pay period of October 5, 2018[1], and (5)

22

23  ------

[1] Plaintiff later stated he made this claim in error, and that he did receive pay for the October 5,
24  2018 pay period.  (Dkt. No. 25-5 at 37.)

Dr. Kim's rating of Plaintiff's performance as "satisfactory" on November 20, 2018. (*Id.* at 23–24.)

On June 2, 2019, Plaintiff submitted responses to a list of questions submitted by ORM as part of its investigation. (*Id.* at 35–49.) Plaintiff disputed the charges underlying his three-day suspension, arguing the patient who asked him not to touch his thumb was improperly seeking disability benefits for a superficial scar on his finger, and that the patient accused Plaintiff of injuring him before Plaintiff even touched him. (*Id.* at 40.) Plaintiff stated that the other patient who accused him of rude behavior was "encouraged" to complain by the Acting Director and the lead clerk to get him into trouble. (*Id.*) With respect to his unauthorized absence, Plaintiff claims that on May 1, 2018 he suffered severe headaches, blurred vision, shaking in his extremities, nausea and significantly increased blood pressure. (*Id.* at 40.) Plaintiff considered leaving work to seek medical care and claims he tried to find the C&P office manager or the service's Acting Director to inform them, but was told by the clerk at the front desk that both were in meetings. (*Id.*) Plaintiff instead informed the service's lead clerk and asked her to relay to them that he was leaving for the day. (*Id.* at 40–41.) ORM submitted its investigative report on July 30, 2019. (*Id.* at 29–34.)

**C. Nguyen's Performance**

In 2016 and 2017, Plaintiff's prior supervisor, Dr. Peter Weber, D.O., rated Plaintiff's performance as "high satisfactory."[2] (Dkt. Nos. 25-4 at 162; 25-5 at 124.) In a mid-term review dated August 28, 2018, Dr. Kim rated Plaintiff's performance as "marginal." (Dkt. No. 25-5 at

---

[2] Under the VA's proficiency rating system, supervisors evaluate employee performance across several categories, including clinical competence, educational competence, research and development, administrative competence, and personal qualities. (*See* Dkt. No. 25-5 at 117.) Supervisors rate employee performance across these categories as "unsatisfactory", "low satisfactory", "satisfactory", "high satisfactory", or "outstanding". (*Id.*)

24.)  On November 27, 2018, Dr. Kim rated Plaintiff's overall performance, for the period between October 1, 2017 and September 30, 2018, as "satisfactory".  (*Id.* at 117–119.)  Dr. LaBelle rated Plaintiff's performance for fiscal year 2019 (October 1, 2018 to September 30, 2019) as "satisfactory."  (Dkt. No. 25-3 at 27.)

On February 4, 2019, Dr. Kim, with input from Dr. LaBelle, placed Plaintiff on a Focused Professional Performance Evaluation ("FPPE") for cause.  (Dkt. No. 25-6 at 145–147.) Dr. Kim described an FPPE as a program designed to address concerns with an employee's performance and to give the employee an opportunity to improve.  (Dkt. No. 25-2 at 22.)  Dr. Kim placed Plaintiff on an FPPE due to concerns over the quality and timeliness of Plaintiff's exam reports.  (Dkt. No. 25-6 at 145.)  Plaintiff successfully completed the FPPE, which lasted from February 5, 2019 to May 5, 2019.  (*Id.* at 142.)

On March 4, 2020, Dr. LaBelle placed Plaintiff on a second FPPE for cause due to renewed concerns over the timeliness of Plaintiff's exam reports.  (*Id.* at 142–143.)  During the relevant period, C&P expected physicians employed by the service to submit 90% of their exam reports in a timely manner.  (Dkt. No. 25-3 at 27–28.)  Plaintiff failed to meet C&P timeliness standards in December 2019, January 2020, and February 2020, during which he completed, respectively, 44%, 32%, and 79% of his exam reports in a timely manner.  (Dkt. No. 25-6 at 142.)  Plaintiff successfully completed the FPPE, which lasted from March 2, 2020 to May 30, 2020.  (*Id.* at 61.)

On October 22, 2020, Dr. LaBelle sent Plaintiff a proposed reprimand.  (*Id.* at 54–56.) Dr. LaBelle cited Plaintiff's failure to complete a report for the BVA within the 7 days prescribed by the C&P's timeliness measures.  (*Id.* at 54.)  Dr. LaBelle stated that Plaintiff failed to complete the report in a timely manner, despite being given additional time to do so.  (*Id.*)  Dr.

1    LaBelle stated Plaintiff's offenses were serious and had caused her to "lose confidence and trust

2    in [Plaintiff's] ability to perform [his] duties appropriately." (*Id.* at 55.) On November 6, 2020,

3    Plaintiff's attorneys submitted a response to the proposed reprimand. (*Id.* at 62–69.) Absent

4    from the record is any indication whether this proposed reprimand resulted in an actual

5    reprimand.

6        **D.  Nguyen Reprimanded Following "Clean Sweep"**

7        On February 13, 2020,[3] the VA conducted a "clean sweep"[4] of the C&P service. Clean

8    sweeps are inspections during which administrative and clinical areas are reviewed by

9    administrative staff using a checklist. (Dkt. Nos. 25-3 at 32; 25-6 at 113–116.) The VA

10   typically conducts clean sweeps on a weekly basis, but on the day of the incident in question, the

11   VA decided to conduct additional sweeps because of an on-site survey by the Veterans

12   Integrated Service Network ("VISN"). (Dkt. Nos. 25-3 at 57–58.) During such surveys, the VA

13   conducts clean sweeps "at least twice daily." (*Id.* at 58.)

14       On February 13, 2020, the employee who conducted the clean sweep, Caryn Sisounthone,

15   sent Dr. LaBelle an email, in which she stated that she found a number of issues with Plaintiff's

16   office. (Dkt. No. 25-6 at 117.) Sisounthone stated Plaintiff left his Personal Identity Verification

17   ("PIV") card in his keyboard "again," that there were food crumbs on Plaintiff's desk and patient

18   examination table, and that Plaintiff had spilled a drink on the examination table. (*Id.*)

19   Sisounthone informed Dr. LaBelle that another employee saw Plaintiff spill coffee on the floor

20   of his office without cleaning it up. (*Id.*)

21

22   [3] There is some dispute concerning whether the clean sweep took place on February 10th or
     February 13th. (*See* Dkt. No. 25-6 at 40.) February 13th appears to be the date when the incident
23   at issue occurred.

24   [4] Also referred to as an Environment of Care ("EOC") inspection. (*See* Dkt. No. 25-6 at 164.)

On March 4, 2020, Plaintiff received a proposed reprimand for the violations discovered during the clean sweep.  (*Id.* at 150–151.)  On March 25, 2020, Acting Associate Director Sean Longosky issued Plaintiff a formal reprimand for failing to safeguard his PIV card and for failure to comply with EOC procedures.  (*Id.*)  Longosky stated the reprimand took into consideration Plaintiff's prior misconduct, including his 2018 suspension and two prior EOC violations in 2019.  (*Id.* at 150.)  Longosky stated the reprimand would remain in Plaintiff's personnel file for three years, but also stated the reprimand might be withdrawn or destroyed after two years, "depending entirely on [Plaintiff's] future behavior and attitude" and would be used to determine appropriate penalties if Plaintiff committed further infractions.  (*Id.*)

On April 1, 2020, Plaintiff filed an administrative grievance challenging the reprimand, arguing the VA could not prove the charges set forth in the reprimand by substantial evidence and that the reprimand was a grossly exaggerated response to his conduct.  (*Id.* at 152.)  On April 30, 2020, Connie Morantes, M.D., the Puget Sound VA's Deputy Chief of Staff, issued a decision striking the letter of reprimand from the record and substituting it with a letter of counseling[5] advising Plaintiff not to leave his PIV card unattended.  (*Id.*)

On April 15, 2020, Plaintiff contacted an EEO counselor.  (Dkt. No. 25-6 at 11–14.)  Plaintiff alleged he was subject to discrimination of the basis of national origin and reprisals for filing EEO complaints.  (*Id.* at 12.)  Plaintiff cited his 2018 EEO complaint against Dr. Kim, the fact that he was "singled out" for a clean sweep, his placement on a performance improvement

---

[5] Dr. LaBelle explained that letters of counseling are typically used for a first offense, while reprimands are typically issued for multiple or repeated offenses.  (Dkt. No. 25-3 at 56–57.)  Both documents go into an employee's personnel file, but remain in the file for different lengths of time.  (*Id.* at 57.)  Letters of written counseling may only be kept or used to support other personnel actions for up to six months unless additional misconduct occurs, and then they may be retained for up to one year.  (Dkt. No. 27-1 at 2.)

plan and the March 2020 reprimand. (*Id.*) Plaintiff alleged his co-workers were "making up stories about him to get him in trouble." (*Id.*) Informal counseling was unsuccessful, and on July 2, 2020, Plaintiff filed a formal EEO complaint. (Dkt. No. 25-6 at 4–9.) Plaintiff again alleged he was subject to discrimination of the basis of national origin and reprisals for filing prior EEO complaints. (*Id.* at 8.)

### E. Nguyen's Federal Complaint

On April 14, 2022, an Administrative Judge ("AJ") for the Equal Employment Opportunity Commission ("EEOC") granted the VA's motion for summary judgment with respect to the claims raised in Plaintiff's December 3, 2018 EEO complaint. (Dkt. No. 22-1 at 3.) The AJ's decision became the Agency's final action on May 24, 2022. (*Id.* at 2.) On June 5, 2023, the EEOC's Office of Federal Operations affirmed the AJ's decision. (*Id.* at 6.) On April 14, 2022, an AJ for the EEOC also granted the VA's motion for summary judgment with respect to the claims raised in Plaintiff's July 2, 2020 EEO complaint. (Dkt. No. 22-3 at 3.) The AJ's decision became the Agency's final action on May 24, 2022. (*Id.* at 2.) On June 5, 2023, the EEOC's Office of Federal Operations affirmed the AJ's decision. (*Id.* at 5.)

On September 1, 2023, Plaintiff, proceeding pro se,[6] filed a complaint in this Court alleging 1) disparate treatment based on race and national origin and 2) retaliation under Title VII of the Civil Rights Act of 1964.[7] (Dkt. No. 1.) On January 17, 2025, Defendant filed the instant motion for summary judgment. (Dkt. No. 21.)

---

[6] Attorney Ada Ko Wong entered an appearance on Plaintiff's behalf on March 29, 2024. (Dkt. No. 11.)

[7] Plaintiff's complaint also contains a cause of action "for [v]iolation of the Rehabilitation Act based on national origin." (Dkt. No. 1 at 6.) The Rehabilitation Act "prohibits federal employers from discriminating against employees because of their disability." *Cummings v. DeJoy*, 700 F.Supp.3d 801, 806 (D. Ariz. 2023). Plaintiff's complaint does not allege the

1

## II.    LEGAL STANDARD

2

A "court shall grant summary judgment if the movant shows that there is no genuine

3    dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

4    R. Civ. P. 56(a).  The moving party may meet this burden by showing the non-moving party has

5    failed to provide evidence in support of their case.  *See Fairbank v. Wunderman Cato Johnson*,

6    212 F.3d 528, 531 (9th Cir. 2000).  In determining whether a genuine dispute of material fact

7    exists, "[t]he deciding court must view the evidence, including all reasonable inferences, in favor

8    of the non-moving party."  *Reed v. Lieurance*, 863 F.3d 1196, 1204 (9th Cir. 2017).  Disputed

9    facts "that might affect the outcome of the suit under the governing law will properly preclude

10    the entry of summary judgment," but irrelevant or inconsequential disputes will not preclude

11    summary judgment.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## III.    DISCUSSION

12

13    ### A.  Disparate Treatment Claims

14

Title VII prohibits employer discrimination based on sex, gender, race, religion, and

15    national origin.  42 U.S.C. § 2000e-2(a)(1).  Employment discrimination disparate treatment

16    claims under Title VII, like Plaintiff makes here, are analyzed using the *McDonnell Douglas*

17

18

19    ────────────────

existence of a disability that would support a cause of action under the Rehabilitation Act.
20    Defendant has not moved for summary judgment on Plaintiff's Rehabilitation Act claim, because
he believes Plaintiff does not want to pursue this claim. (Dkt. No. 21 at 10–11.)  Plaintiff's
21    response to Defendant's motion for summary judgment (Dkt. No. 24) makes no mention of
Plaintiff's Rehabilitation Act claim.  In failing to respond to Defendant's assertion that he does
22    not want to pursue his Rehabilitation Act claim, Plaintiff has effectively abandoned it, and
Plaintiff's Rehabilitation Act claim is therefore DISMISSED.  *Qualey v. Pierce County*, Case
23    No. 3:23-cv-05679-TMC, 2025 WL 306421 at *12 (W.D. Wash. Jan. 27, 2025) ("When a party
fails to respond to an argument made to dismiss a claim, the argument is waived.") (collecting
24    cases).

1    *Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting test.  *Hittle v. City of Stockton, California*,

2    76 F.4th 877, 887 (9th Cir. 2023).

3        Under the *McDonnell Douglas* test, a plaintiff alleging an employer engaged in

4    discriminatory conduct adversely affecting their employment must first establish a prima facie

5    case.  *Hittle*, 76 F.4th at 887.  If a plaintiff makes a prima facie case of discrimination,  "the

6    burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the

7    challenged action." *Opara v. Yellen*, 57 F.4th 709, 723 (9th Cir. 2023) (cleaned up).  Once "an

8    employer articulates some legitimate, nondiscriminatory reason for the challenged action," in the

9    third step, "the employee must show that the articulated reason is pretextual."  *Id.*

10       1.   <u>Plaintiff's Prima Facie Case on Disparate Treatment</u>

11        The prima facie case requires a plaintiff to show: (1) they are a member of a protected

12    class; (2) they were performing satisfactorily; (3) they experienced an adverse employment

13    action; and (4) similarly situated individuals outside their protected class were treated more

14    favorably, or other circumstances surrounding the adverse employment action give rise to an

15    inference of discrimination.  *Hittle*, 76 F.4th at 887.

16        Defendant argues Plaintiff has presented no direct evidence of discrimination based on

17    national origin, such as discriminatory remarks by a decision maker, and that he has no evidence

18    at all to support his claims beyond a vague assertion that the "totality" of the circumstances

19    surrounding his interactions with agency personnel.  (Dkt. No. 21 at 11–13.)

20        With respect to Plaintiff's disparate treatment claims, the Court must examine the

21    suspension, performance appraisals, reprimands, proposed reprimands, and performance

22    improvement plans separately under the *McDonnell Douglas* analysis as they constitute separate,

23    discrete actions.  *Covarrubias v. Brink's, Inc.*, Case No. 05-5196, 2006 WL 3203733, at *6

24

1   (W.D. Wash. Nov. 3, 2006);  *Guthrie v. Hurwitz*, Case No. 1:18-cv-282 AWI-BAM, 2018 WL

2   6460093, at *4 (E.D. Cal. Dec. 10, 2018) ("The classic [Title VII] discrimination claim is one

3   that alleges an unlawful discrete act—something that occurred on the day it happened, such as a

4   'termination, failure to promote, denial of transfer, or refusal to hire.'" (internal citation

5   omitted)).

6        *a.   2018 EEO Complaint*

7          i.   <u>Performance Reviews</u>

8      Defendant argues Plaintiff's 2018 performance reviews were not "adverse" employment

9   actions.  (Dkt. No. 21 at 14.)  Defendant argues the ratings of "marginal" and "satisfactory"

10  Plaintiff received in 2018 were not negative and did not affect his compensation or terms of

11  employment.  (*Id.*)  Plaintiff argues the reduced performance ratings diminished his professional

12  reputation and could adversely impact his career trajectory.  (Dkt. No. 24 at 13.)

13     "[A]n adverse employment action is one that 'materially affects the compensation, terms,

14  conditions, or privileges of employment.'"  *Campbell v. Hawaii Dep't of Educ.*, 892 F.3d 1005,

15  1012 (9th Cir. 2018) (quoting *Davis v. Team Elec. Co.*, 520 F.3d 1080, 1089 (9th Cir. 2008)).

16  This means that "[a]bsent a material change in the terms and conditions of employment, an

17  employment action that is humiliating or embarrassing . . . does not constitute an adverse

18  employment action."  *Chiang v. Gonzales*, Case No. CV 05-03273 MMM (Ex) 2005 WL

19  8168158, at *11 (C.D. Cal. Dec. 7, 2005) (collecting cases); *see also Stewart v. Evans*, 275 F.3d

20  1126, 1136 (D.C. Cir. 2002) ("[L]oss of reputation does not constitute an adverse employment

21  action under Title VII").  Also, "a mediocre performance rating that does not give rise to any

22  further negative employment action does not constitute an adverse employment action."

23  *Guerrero v. Hawaii*, 662 F. Supp. 2d 1242, 1257 (D. Haw. 2009) (internal citation omitted).  But

24

1   an undeserved performance rating can constitute an adverse employment action. *Yartzoff v.*

2   *Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987). However, when a Title VII plaintiff rests a claim

3   of adverse employment action on an event that does not involve loss of pay or benefits, the

4   relevant question is whether the employment action resulted in "materially adverse consequences

5   affecting . . . [a plaintiff's] future employment opportunities such that a reasonable trier of fact

6   could conclude that the plaintiff has suffered objectively tangible harm." *Erwin v. OBI Seafoods,*

7   *LLC*, Case No. 2:22-cv-00893-JHC2024 WL 1138905, at *6–7 (W.D. Wash. Mar. 15, 2024)

8   (internal citations omitted).

9         Here, Plaintiff's 2018 "marginal" and "satisfactory" performance reviews, without more,

10   do not constitute adverse employment actions. Even if Plaintiff could argue these performance

11   ratings resulted in some sort of reputational damage, such reputational damage would not

12   constitute an adverse employment action. This is because Plaintiff does not identify how these

13   performance reviews affected Plaintiff's future employment opportunities such that a reasonable

14   trier of fact could conclude he suffered objectively tangible harm.[8] *See Lyons v. England*, 307

15   F.3d 1092, 1108, 1118 (9th Cir. 2002) ("[Plaintiff] does not allege [his employer] has either

16   relied upon the [] evaluations in making a further employment decision adverse to [plaintiff] or

17   published these evaluations by making them available to other potential employers . . . [nor does

18   plaintiff] allege that his mediocre evaluations were accompanied by any meaningful change in

19   work assignments, either in the form of relieving him of responsibilities or saddling him with

20   additional, burdensome tasks."). Accordingly, the 2018 performance reviews do not support

21   Plaintiff's Title VII claim.

22

23   ───────────
     [8] In a declaration, Dr. LaBelle asserted that "[i]nterim appraisals or year-end appraisals do not
24   affect an employee's compensation, terms, conditions, or privileges of employment." (Dkt. No.
     23 at 1.)

1

2

ii. <u>Suspension</u>

With respect to Plaintiff's three-day suspension, Defendant argues Plaintiff has failed to

3 put forth any comparable individuals Dr. Kim treated differently in 2018. (Dkt. No. 21 at 14.)

4 "[A] plaintiff may demonstrate an inference of discrimination through comparison to similarly

5 situated individuals, or any other circumstances surrounding the adverse employment action that

6 give rise to an inference of discrimination." *Hittle* 76 F.4th at 887.

7 In his complaint, Plaintiff alleges Dr. Kim suspended him for calling a patient outside

8 normal duty hours "although a Caucasian colleague did the same and was not reprimanded."[9]

9 (Dkt. No. 1 at 3.) Plaintiff asserts that even though the proposed 14-day suspension was reduced

10 to three days on appeal, "there should not have been any discipline" at all. (*Id.*) Plaintiff's

11 complaint does not name the Caucasian colleague in question, and the Court notes that calling

12 patients outside office hours was not one of the reasons Dr. Kim cited in his letter proposing

13 Plaintiff's suspension, although it may have been an aggravating factor.

14

15

16

17

18

19

20

21

22

23

24

---

[9] Plaintiff appears to be referencing a 2017 incident in which Dr. Kim disciplined Plaintiff for calling a patient outside normal duty hours. (Dkt. Nos. 25-4 at 36; 25-6 at 47.) Plaintiff alleged there was no official VA policy preventing physicians from doing so, and that a Caucasian colleague, Heidi Terrio, M.D., also called a patient after hours and was not disciplined. (Dkt. No. 25-6 at 47.) Plaintiff's December 3, 2018 EEO complaint does not appear to mention this incident, the record contains no letter of reprimand concerning it, and it is unclear precisely what disciplinary action Dr. Kim took against Plaintiff—there is only a brief note indicating that Plaintiff was "disciplined" following the incident. (*See* Dkt. No. 25-6 at 39.) There are several references in the record to a written counseling Plaintiff received on February 1, 2018 for "failure to follow appropriate protocols for patient-related encounters," which was cited as an aggravating factor in Plaintiff's suspension. (Dkt. Nos. 25-2 at 26–27; 25-5 at 122.) It is unclear if this is the disciplinary action stemming from Plaintiff's after hours call, although that is the assumption under which Plaintiff appears to proceed. During his deposition, Plaintiff appeared to state that Dr. Terrio wrote a letter of support "telling [Dr. Kim] that she [called a patient after hours] and nothing happened to her." (Dkt. No. 25-4 at 37.) The letter from Dr. Terrio does not appear in the record.

Plaintiff does not cite any similarly situated individuals who were treated more favorably by Dr. Kim during this period. "[I]ndividuals are similarly situated when they have similar jobs and display similar conduct." *Vasquez v. Cnty. of L.A.*, 349 F.3d 634, 641 (9th Cir. 2003)). Here, an adequate comparator would be an individual who held a similar job to Plaintiff during the same period, engaged in similar conduct to that which gave rise to Plaintiff's 2018 suspension, and was treated more favorably by Dr. Kim. *See e.g., Griffin v. Boeing Co.*, Case No. 13-0038, 2015 WL 13333180, at *3 (W.D. Wash. June 25, 2015) (An adequate comparator is a co-worker who is who is similarly situated to plaintiff "in all material respects."). Plaintiff has identified no such comparator with respect to his 2018 suspension.

iii.  The VA's Non-Discriminatory Reasons

Defendant argues that the VA had legitimate, non-discriminatory reasons for suspending Plaintiff, specifically his mistreatment of patients and co-workers.[10] (Dkt. No. 21 at 15.) To meet its burden showing a legitimate, non-discriminatory reason for an adverse employment action, a defendant must "raise[ ] a genuine issue of fact as to whether it discriminated against the plaintiff" by presenting admissible evidence supporting a "legitimate, nondiscriminatory reason" for the adverse employment action. *Texas Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254–255 (1981). The defendant "need not persuade the court that it was actually motivated by the proffered reasons." *Id.* at 254.

Plaintiff does not appear to dispute Dr. Kim provided legitimate, non-discriminatory reasons for his suspension, but does contend these reasons were pretextual.

---

[10] The Court notes that in reducing Plaintiff's proposed 14-day suspension to 3 days, Medical Center Director Michael Tadych sustained the charges related to unprofessional conduct, absence without official leave, and failure to follow leave procedures, but apparently did not sustain the charges related to inappropriate behavior and comments toward patients and staff members. (Dkt. No. 25-5 at 136–137.)

1

iv.  Plaintiff's Showing of Pretext

2        Plaintiff argues there is a genuine issue of material fact concerning whether Dr. Kim's

3   decision to propose a 14-day suspension, which Plaintiff characterizes as an unusually harsh

4   punishment, was a deviation from usual disciplinary norms which "may strongly suggest

5   discriminatory intent."  (Dkt. No. 24 at 16.)  Plaintiff contends the VA "repeatedly departed from

6   standard protocols" in penalizing Plaintiff "more harshly than colleagues for comparable or

7   lesser offenses."  (*Id.*)  With respect to Plaintiff's suspension, Plaintiff cites the decision of

8   Medical Center Director Tadych to reduce Plaintiff's suspension from 14 days to three as

9   evidence that Dr. Kim "never genuinely believed a 14-day penalty was warranted" and proposed

10  a lengthier suspension for discriminatory reasons.  (*Id.*)  Plaintiff also cites the written counseling

11  he received in February 2018, arguing Dr. Kim "effectively overruled" the conclusion of another

12  supervisor, a "departure from deferring to the prior supervisor's investigative outcome show[ing]

13  inconsistency that a factfinder may deem pretextual."[11]  (*Id.*)

14       If an employer offers a legitimate, nondiscriminatory reason for the adverse employment

15  action, the burden shifts back to the plaintiff to demonstrate pretext.  *Kama v. Mayorkas*, 107

16  F.4th 1054, 1059 (9th Cir. 2024).  A plaintiff can establish pretext "(1) directly, by showing that

17  unlawful discrimination more likely [than not] motivated the employer; [or] (2) indirectly, by

18  showing that the employer's proffered explanation is unworthy of credence because it is

19  internally inconsistent or otherwise not believable; or via a combination of the[se] two kinds of

20  evidence."  *Id.* (internal citations omitted).

21

22

23  [11] Dr. Kim had difficulty remembering whether he was in fact the individual who issued the
    written counseling to Plaintiff in February 2018.  (Dkt. No. 25-2 at 31–35.)

24

1    At the pretext stage, the plaintiff's burden remains low, and "very little[ ] evidence is

2  necessary to raise a genuine issue of fact regarding an employer's motive." *Opara*, 57 F.4th at

3  723–724 (internal citation omitted).  If there is "abundant and uncontroverted independent

4  evidence" supporting the defendant's stated motive, then "plaintiff's 'creat[ion of] only a weak

5  issue of fact as to whether the employer's reason was untrue' will not suffice." *Id.* at 724.

6    Defendant contends Plaintiff has not presented sufficient evidence of pretext with respect

7  to either his performance reviews or his suspension.  (Dkt. No. 21 at 15–16.)  Defendant argues

8  that while Plaintiff may disagree with Dr. Kim's reasons for suspending him, he does not dispute

9  that he engaged in the conduct that led to his suspension and relies only on his own self-

10 assessment of whether his actions warranted the discipline imposed.  (*Id.* at 16.)

11   Here, Plaintiff has failed to raise a genuine issue of fact concerning whether Dr. Kim's

12 proffered reasons for suspending him in 2018 were a mere pretext for discrimination.  The fact

13 that the length of Plaintiff's suspension was reduced on appeal does not give rise to an inference

14 that Dr. Kim "departed from standard protocols" in recommending a longer suspension, given

15 that Plaintiff has presented no argument concerning what the VA considered "standard"

16 discipline in cases such as Plaintiff's.[12]  *Bradley v. Harcourt, Brace & Co.*, 104 F.3d 267, 270

17 (9th Cir. 1996) (To avoid summary judgment, a plaintiff must produce "specific, substantial

18 evidence of pretext.").

19   Similarly, Plaintiff has not raised a genuine factual dispute concerning whether Plaintiff's

20 2018 performance reviews of "marginal" and "satisfactory" were pretextual.

21

22 [12] Dr. Kim testified that he calculated the 14-day suspension based on a "table of penalties", a
grid used by VA supervisors to determine the appropriate disciplinary action.  (Dkt. No. 25-2 at
23 26.)  In the proposed suspension Dr. Kim sent Plaintiff on July 12, 2018, he included what
appears to be a copy of the "table of penalties," which indicates that a 14-day suspension is
24 within the range of acceptable penalties for second offenses.  (Dkt. No. 25-5 at 124–125.)

In summary, Plaintiff has not established a prima facie case of disparate treatment with respect to his 2018 performance reviews or his suspension. Even if he had done so, the VA identified legitimate, non-discriminatory reasons for these actions, and Plaintiff has failed to establish the VA's reasons for the challenged actions were pretextual.

### b. 2020 EEO Complaint

#### i. March 2020 Letter of Reprimand

Defendant argues the March 25, 2020 letter of reprimand was not an adverse employment action because it did not affect Plaintiff's compensation or terms of employment. (Dkt. No. 21 at 17.) The Court disagrees. "[W]ritten letters of reprimand may . . . constitute adverse employment actions because they may affect later discipline." *Lewis v. Bd. of Regents Nev. Sys. of Higher Ed.*, Case No. 2:17-CV-1158 JCM (VCF), 2017 WL 4780612, at *4 (D. Nev. Oct. 23, 2017). Defendant contends the letter of reprimand was later reduced to a written counseling (Dkt. No. 21 at 7), however, as the facts of this case demonstrate, written counseling letters may also affect later discipline. (*See* Dkt. No. 25-5 at 122.)

Defendant next argues Plaintiff cannot establish a prima facie case of disparate treatment with respect to the March 2020 letter because he cannot show that similarly situated employees were treated more favorably. (Dkt. No. 21 at 17–18.) In his complaint, Plaintiff asserts he was "singled out" for an investigatory clean sweep in February 2020. (Dkt. No. 1 at 4.) Plaintiff identifies two comparators whom he asserts were treated more favorably following the clean sweep. Plaintiff alleges Dr. Lehila Stanton, M.D., a fellow C&P physician examiner whom Plaintiff identifies as an "Asian Indian female" was not disciplined following the clean sweep even though she had "visible prohibited items" in her office, such as a teapot. (*Id.* at 3.) Plaintiff also asserts that Dr. James Joubert, M.D., whom Plaintiff identifies as a "Caucasian male" was

also not reprimanded following the clean sweep despite having "unpermitted exercise

equipment" in his office.[13] [14] (*Id.*)

      With respect to the allegations in his complaint, Plaintiff asserted he was only "guessing"

these physicians were not disciplined for the infractions he cited in his complaint.  (Dkt. No. 25-

4 at 78–79.)  To the extent Plaintiff asserts the clean sweep itself was an instance of disparate

treatment, there is no evidence that Plaintiff was "singled out" for a clean sweep on the day in

question.  Rather, 22 staff members at the American Lake and Seattle divisions of the C&P

service were subject to clean sweeps on the same day.  (Dkt. No. 22-4 at 3–4.)  To the extent

Plaintiff alleges he was treated more harshly than other employees for similar infractions, both

Dr. Stanton and Dr. Joubert were subject to the February 2020 clean sweep, and both were issued

written counseling letters after beverage containers were found inside their examination rooms

during a clean sweep conducted in April 2020.  (Dkt. Nos. 25-3 at 54–57; 27 at 4–7.)

      Plaintiff argues the VA "deviated from usual disciplinary practices" by "escalating" his

clean sweep violations to a reprimand from a counseling.  (Dkt. No. 24 at 14-15.)  Plaintiff

contends the VA's decision to reduce the reprimand to a written counseling "shows pretext and

falsity of reason" for the initial reprimand and indicates the VA's proffered rationale for

---

[13] The record also contains information concerning discipline imposed upon Dr. Melissa
Cordova, AuD, a staff audiologist at the C&P service.  Plaintiff's complaint does not mention her
as a potential comparator, but she appears to be situated similarly to Dr. Stanton and Dr. Joubert,
given that her office was searched during the February 13, 2020 clean sweep and she was
disciplined with a written counseling letter when a beverage container was found in her
examination room during an April 2020 clean sweep.  (Dkt. Nos. 22-4 at 3–4; 27 at 2–3.)

[14] It also is unclear from the record whether these items in fact were prohibited items.  For
example, the clean sweep checklist seems to indicate coffee pots and hot water containers are
acceptable if they are inspected and have a sticker attached.  (*See* Dkt. No. 25-6 at 113.)

1    discipling Plaintiff—maintaining exam-room cleanliness—was a pretext for discrimination.  (*Id.*

2    at 15.)

3         The Court questions whether Dr. Stanton and Dr. Joubert are appropriate comparators,

4    given that among Plaintiff's alleged clean sweep violations was his failure to keep track of his

5    PIV card, an infraction not committed by either physician.  (*See* Dkt. No. 27 at 4–7.)  Despite

6    this, Plaintiff was subject to precisely the same ultimate discipline as Dr. Stanton and Dr.

7    Joubert, even though his infractions were initially more serious.  Moreover, Dr. LaBelle testified

8    that Plaintiff initially received a letter of reprimand rather than a written counseling because of

9    his prior infractions, whereas Dr. Stanton and Dr. Joubert apparently had no prior disciplinary

10   history, as written counseling letters are typically utilized for first offenses.  (Dkt. No. 25-3 at

11   56–57.)

12        Based on these facts, Plaintiff cannot establish his prima facie case of disparate treatment

13   with respect to the March 2020 reprimand because he cannot show that similarly situated

14   individuals were treated more favorably.

15                        ii.   March 2020 FPPE

16        Defendant argues Plaintiff cannot establish a prima facie case of disparate treatment with

17   respect to the March 2020 FPPE because there is no comparator for his claim.  (Dkt. No. 21 at

18   19.)  Dr. LaBelle asserted that no other staff physician, other than Plaintiff, fell below the C&P

19   service's 90% timeliness standard in any given month between March 3, 2019, and December

20   31, 2020, which is why Plaintiff was placed on an FPPE.  (Dkt. No. 23 at 1.)  Plaintiff asserts Dr.

21   LaBelle's decision to place him on an FPPE did not account for Plaintiff's workload and

22   personal hardships, including the death of his tennis partner.  (Dkt. Nos. 1 at 4–5; 24 at 15.)

23

24

1       Even assuming Dr. LaBelle's decision to place Plaintiff on a FPPE did not properly

2  account for Plaintiff's circumstances, there is no evidence that any other similarly situated C&P

3  physicians were treated more favorably, nor is there anything about the circumstances that would

4  give rise to an inference of discrimination.

5       Accordingly, Plaintiff cannot establish a prima facie case of disparate treatment with

6  respect to the March 2020 FPPE.

7                   iii.   October 2020 Proposed Reprimand

8       Defendant argues the October 2020 proposed reprimand does not constitute an adverse

9  employment action because it did not impact Plaintiff's compensation or terms of employment.

10  (Dkt. No. 21 at 17.)  Defendant further contends Plaintiff cannot establish a prima facie case of

11  disparate treatment with respect to the March 2020 FPPE because his workload is the same as

12  any other C&P staff physician, and there is therefore no comparator for his claim.  (*Id.* at 19.)

13       Plaintiff does not respond to either of these arguments or otherwise offer contradicting

14  facts.  *Heinemann v. Satterberg*, 731 F.3d 914, 917 (9th Cir. 2013) (While a non-movant's failure

15  to respond to arguments made in a motion for summary judgment does not constitute "a

16  complete abandonment of its opposition to summary judgment[,]" an "opposing party's failure to

17  respond to a fact asserted in the motion permits a court to 'consider the fact undisputed for the

18  purposes of the motion.'").

19       Moreover, the Court is inclined to agree with Defendant that a proposed reprimand

20  cannot constitute an adverse employment action if it does not have a material effect on the terms

21  and conditions of Plaintiff's employment, and it is unclear from the record whether the proposed

22  reprimand led to any further disciplinary action or other consequences.  *See Garza v. Blinken*,

23  Case No. 21-cv-02770 (APM), 2023 WL 2239352 at *5 (D.D.C. Feb. 27, 2023) ("[Plaintiff] does

24

1    not state that the proposed letter of reprimand resulted in an office transfer, a change in

2    responsibilities, or *anything* to suggest that the terms and conditions of her employment were

3    affected *at all*." (italics in original)).

4         Accordingly, Plaintiff has failed to establish a prima facie case of discrimination based on

5    disparate treatment.

6                           iv.   The VA's Non-Discriminatory Reasons

7         Even if Plaintiff had established a prima facie case of disparate treatment, Defendant

8    argues the VA had legitimate, non-discriminatory reasons for the disciplinary actions it took

9    against Plaintiff in 2020.  With respect to the March 2020 reprimand, Defendant argues the VA

10   had a legitimate interest in preserving the cleanliness of exam rooms and the safety of PIV cards

11   issued to employees.  (Dkt. No. 21 at 20.)  As for the March 2020 FPPE and the October 2020

12   proposed reprimand, Defendant argues the VA had a legitimate, non-discriminatory reason for

13   disciplining Plaintiff, namely its interest in ensuring that exam reports are submitted in a timely

14   manner, which is "essential to evaluating cases and assisting veterans in need."  (*Id.* at 20–21.)

15        With respect to articulating a legitimate, non-discriminatory reason for the challenged

16   action, the VA's burden "is one of production, not persuasion and involves no credibility

17   assessment."  *Opara* 57 F.4th at 723.  Plaintiff does not dispute the VA's cited reasons for the

18   2020 disciplinary actions were legitimate, but again argues they were a mere pretext for

19   discrimination based on his national origin.

20                           v.   Plaintiff's Showing of Pretext

21        Since the VA has met its burden to explain the measures taken against Plaintiff, the

22   burden shifts back to the Plaintiff to show that the VA's articulated reasons are pretextual.

23   *Opara* 57 F.4th at 726.  Plaintiff again argues the VA's "deviation from usual procedures or

24

1    disciplinary norms" is suggestive of discriminatory intent.  With respect the March 2020

2    reprimand, Plaintiff argues the VA's decision to reduce the discipline imposed on Plaintiff from

3    a reprimand to a written counseling indicates Plaintiff's punishment was "unwarranted or

4    excessive" and represents another "clear deviation" from normal disciplinary practices that

5    supports an inference that Dr. LaBelle's actions were a pretext for discrimination.  (Dkt. No. 24

6    at 17.)  As for the March 2020 FPPE, Plaintiff argues Dr. LaBelle placed him on the FPPE

7    despite initially being understanding of the delay in submission of his reports following the death

8    of his tennis partner, a "sudden shift" in behavior that indicates Dr. LaBelle's decision to

9    discipline Plaintiff was not truly motivated by performance concerns.  (*Id.* at 17.)  Plaintiff also

10   cites various statements made by Dr. Kim during the deposition, including his uncertainty

11   concerning when he learned of Plaintiff's national origin, and Dr. Kim's attempt to "minimize or

12   deny" the existence of a prior agency decision regarding national origin discrimination in which

13   Dr. Kim was implicated.  (Dkt. No. 24 at 17–18.)

14          The circumstantial evidence Plaintiff cites, and the inference of discrimination he draws

15   from it, are insufficient to meet Plaintiff's burden of putting forward "specific and substantial

16   evidence challenging the credibility of the employer's motives."  *Mayes v. WinCo Holdings*, Inc.,

17   846 F.3d 1274, 1282 (9th Cir. 2017).  Here, the evidence cited by Plaintiff is neither specific nor

18   substantial, and the conclusions Plaintiff attempts to draw from that evidence consist of little

19   more than idle speculation.  Moreover, there is "abundant and uncontroverted independent

20   evidence" supporting Defendant's stated motives for disciplining Plaintiff.  *Opara*, 57 F.4th at

21   724.

22          In summary, Plaintiff has not established a prima facie case of disparate treatment with

23   respect to his 2018 performance reviews, his suspension, or the disciplinary actions the VA took

24

1  against him in 2020.  Even if he had done so, the VA had legitimate, non-discriminatory reasons

2  for these actions, and Plaintiff has failed to establish the VA's reasons for the challenged actions

3  were pretextual.  Accordingly, Defendant's motion for summary judgment with respect to

4  Plaintiff's Title VII disparate treatment claims is GRANTED.

5      **B.  Retaliation Claim**

6          To make a claim for retaliation under Title VII, a plaintiff must make a prima facie case

7  showing: "(1) involvement in a protected activity, (2) an adverse employment action and (3) a

8  causal link between the two."  *Brooks v. City of San Mateo*, 229 F.3d 917, 928 (9th Cir. 2000).

9  If a plaintiff establishes a prima facie case , the *McDonnell Douglas* burden shifting test applies.

10  *Vasquez v. Co. of Los Angeles*, 349 F.3d 634 (9th Cir. 2003).

11      1.  <u>Plaintiff's Prima Facie Case on Retaliation</u>

12          Plaintiff asserts he engaged in protected activity when he contacted EEO counselors and

13  filed EEO complaints in 2018 and 2020.  (Dkt. Nos. 1 at 3; 24 at 19.)  Filing a charge or

14  complaint constitutes protected activity for purposes of a Title VII retaliation claim.  *Raad v.*

15  *Fairbanks N. Star Borough Sch. Dist.*, 323 F.3d 1185, 1197 (9th Cir. 2003).

16          Plaintiff alleges that after each instance of protected activity, Plaintiff faced a series of

17  adverse employment actions.  Plaintiff alleges that in 2018, shortly after contacting the EEO

18  counselor, he received low performance ratings.  (Dkt. No. 24 at 19.)  Plaintiff further contends

19  that after filing another EEO complaint, he experienced heightened scrutiny, was placed on an

20  FPPE, and received a formal reprimand.  (*Id.*)

21          For purposes of the causation element, "Title VII retaliation claims require proof that the

22  desire to retaliate was the but-for cause of the challenged employment action."  *Univ. of Texas*

23  *Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 133 (2013).  "[T]his burden on the plaintiff to establish

24

1  that his or her protected activity was a but-for cause of the alleged adverse action by the

2  employer is more demanding than the motivating-factor standard." *Stilwell v. City of Williams*,

3  831 F.3d 1234, 1247 (9th Cir. 2016).  "Causation sufficient to establish the third element of the

4  prima facie case may be inferred from circumstantial evidence, such as the employer's

5  knowledge that the plaintiff engaged in protected activities and the proximity in time between the

6  protected action and the allegedly retaliatory employment decision." *Yartzoff v. Thomas*, 809

7  F.2d 1371, 1376 (9th Cir. 1987).

8       Here, Plaintiff's argument concerning retaliation rests primarily on the temporal

9  proximity between his protected activity and the adverse employment actions.  "Temporal

10  proximity can support both a prima facie case of retaliation and a showing of pretext." *Kama*,

11  107 F.4th at 159.  "However, the inquiry is fact-specific and depends on both the degree of

12  proximity and what, if any, other evidence supports an inference of pretext." *Id.* at 159–160.

13  "Even cases involving very close temporal proximity have generally featured independent

14  evidence of discrimination or retaliation." *Id.* (collecting cases).

15       With respect to the degree of proximity, there is no bright-line rule about the timing of

16  retaliation.  *Coszalter v. City of Salem*, 320 F.3d 968, 978 (9th Cir. 2003).  "There is no set time

17  beyond which acts cannot support an inference of retaliation, and there is no set time within

18  which acts necessarily support an inference of retaliation.  Whether an adverse employment

19  action is intended to be retaliatory is a question of fact that must be decided in the light of the

20  timing and the surrounding circumstances." *Id.*

21       Here, the length of time between Plaintiff's 2018 protected activity, namely his initial

22  contact with an EEO counselor, and his performance rating of "marginal" was relatively short:

23  Plaintiff contacted the EEO counselor on August 14, 2018, and Dr. Kim issued the performance

24

rating on August 28, 2018.  (Dkt. No. 25-5 at 11, 24.)  However, as discussed above, Plaintiff's

performance review, without more, likely does not constitute an adverse employment action.

Even if it did, Plaintiff has not set forth independent evidence of retaliation.  *Kama*, 107 F.4th at

159.

Plaintiff cannot rely on temporal proximity to allege retaliation with respect to the 2020

disciplinary actions.  With respect to the March 2020 reprimand and FPPE, these came more

than one year after Plaintiff's contact with the EEO counselor and his decision to file a formal

EEO complaint on December 3, 2018.  (Dkt. No. 25-5 at 3.)  Plaintiff also did not file an

administrative grievance challenging the March 2020 reprimand until April 1, 2020 (Dkt. No.

25-6 at 152), and did not contact an EEO counselor until April 15, 2020.  (*Id.* at 11–14.)

Accordingly, Plaintiff has not established a prima facie case of retaliation.

### 2. VA's Non-Retaliatory Reason

Even if a prima facie case had been presented, the VA has set forth non-retaliatory

reasons for disciplining Plaintiff sufficient to meet its burden of identifying a non-retaliatory

reasons for disciplining the Plaintiff.  *Opara*, 57 F.4th at 723.

### 3. Plaintiff's Showing of Pretext

The burden then shifts back to Plaintiff to show that the VA's proffered reason was

pretextual.  *Opara*, 57 F.4th at 723.  Plaintiff argues the same evidence of "policy deviations,

factually questionable justifications, and inconsistent explanations" that support Plaintiff's

disparate treatment claim "also underscore the pretextual nature of the Agency's proffered

reasons for its retaliatory actions."  (Dkt. No. 24 at 20.)  For the reasons discussed above,

Plaintiff has not met his burden of establishing pretext.

1    Accordingly, Defendant's motion for summary judgment as to Plaintiff's retaliation

2    claim is GRANTED.

3    **C.  Hostile Work Environment Claim**

4    There is some uncertainty concerning whether Plaintiff is pursuing a hostile work

5    environment claim.  Plaintiff's response to Defendant's motion for summary judgment is

6    somewhat ambivalent, discussing the merits of Plaintiff's hostile work environment claim "if

7    applicable."  (Dkt. No. 24 at 21.)

8    To establish discrimination under a hostile work environment theory pursuant to Title

9    VII, a plaintiff must show they were subjected to sex, race, religion or national origin-based

10   "harassment that was sufficiently severe or pervasive to alter the conditions of employment, and

11   that [their] employer is liable for this hostile work environment."  *Christian v. Umpqua Bank*,

12   984 F.3d 801, 809 (9th Cir. 2020).

13   Plaintiff's complaint, in setting forth his disparate treatment claim, does briefly allege the

14   existence of "severe and/or pervasive" harassment based on race.  (Dkt. No. 1 at 5.)  In his

15   response, Plaintiff alleges the same conduct underlying his disparate treatment and retaliation

16   claims is sufficient to establish a hostile work environment claim.  (Dkt. No. 24 at 21–23.)

17   A plaintiff bringing a Title VII hostile work environment claim "must show

18   discrimination on account of membership in a protected class."  *Sharp*, 69 F.4th at 978.  For the

19   reasons discussed above, Plaintiff has presented no evidence that the alleged workplace

20   harassment of which he complains was on account of his membership in a protected class.[15]

21

22   [15] Plaintiff's response makes much of a March 26, 2020 incident during which Dr. LaBelle called
     a "code green" during a meeting with Plaintiff and his union representative.  VA employees
23   initiate a code green when they feel threatened or have concerns about their safety.  (Dkt. No. 25-
     2 at 18.)  Dr. LaBelle stated she called the code green because she felt the union representative, a
24

1    Accordingly, to the extent Plaintiff's complaint contains a hostile work environment

2    claim, Defendant's motion for summary judgment as to that claim is GRANTED.

3    **IV.    ORDER**

4    Defendant's motion for summary judgment (Dkt. No. 21) is GRANTED.  Plaintiff's

5    claims are DISMISSED with prejudice.  Having dismissed Plaintiff's claims, the Parties' motion

6    to stay (Dkt. No. 28) is DENIED at MOOT.

7

8    Dated this 31st day of March, 2025.

9

10

11    David G. Estudillo
     United States District Judge

12

13

14

15

16

17

18

19    "large man" whom she did not expect to be there, stood up "in a very aggressive manner" and
     began moving towards her, an act that she perceived as "very threatening and hostile" based on

20    his body language, tone of voice, and the "outward aggression that he was displaying." (Dkt. No.
     25-3 at 41–42.)  Plaintiff alleges Dr. LaBelle's reaction to the union representative, an African-

21    American male, supports various aspects of his claim, including his hostile work environment
     claim.  Even if Dr. LaBelle's reaction was the result of fear and/or animus towards African-

22    Americans, the incident in question appears to be an isolated interaction between Dr. LaBelle
     and a third party, and cannot form the basis of Plaintiff's hostile work environment claim.

23    *Sharp,* 69 F.4th at 978 ("Workplace conduct is to be viewed cumulatively and contextually,
     rather than in isolation . . . [t]his approach makes common sense in order to screen out one-off,

24    isolated events and yet benchmark conduct in the context of a specific workplace.").